TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
STEVEN M. ARKOW
Assistant United States Attorney
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-6975
     Facsimile: (213) 894-6269
     E-mail:    steven.arkow@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>STEVE KATSUYA AKUNE,<br><br>        Defendant. | No. CR 20-505-FMO<br><br>GOVERNMENT'S COMBINED CONCURRENCE IN THE FINDINGS OF THE PRESENTENCE INVESTIGATION REPORT AND POSITION RE: SENTENCING OF DEFENDANT STEVE KATSUYA AKUNE<br><br>**Sentencing: September 9, 2021** |

    Plaintiff United States of America, by and through its counsel
of record, the Acting United States Attorney for the Central District
of California and Assistant United States Attorney Steven M. Arkow,
files the *Government's Combined Objection to the Presentence
Investigation Report and Position Re: Sentencing of Defendant Steve
Katsuya Akune*.

    The government's position is based upon the attached memorandum
of points and authorities, the plea agreement (CR 8), the files and
records in this case, the Presentence Investigation Report (CR 24),

//

the Disclosed Probation Recommendation Letter (CR 23), Defendant's
Sentencing Position, With Exhibits (to be filed[1]) ("Def. Sen. Pos.")
and such further evidence and argument as the Court may permit.

Dated: August 23, 2021                Respectfully submitted,

                                      TRACY L. WILKISON
                                      Acting United States Attorney

                                      SCOTT M. GARRINGER
                                      Assistant United States Attorney
                                      Chief, Criminal Division

                                      _____
                                      STEVEN M. ARKOW
                                      Assistant United States Attorney

                                      Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA

---

[1] Pursuant to the parties' agreement when the sentencing hearing
was continued at defendant's request, defense counsel has provided
the government with an unfiled brief of defendant's sentencing
position and a psychological assessment by Jeffrey W. Whiting, Ph.D.
in advance of filing, so no document control Clerk's Record number
for defendant's sentencing position is yet available to cite; this
government's sentencing position herein cites to the page numbers in
the documents the defense provided to the government.

**<u>TABLE OF CONTENTS</u>**

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.   INTRODUCTION AND THE PRESENTENCE INVESTIGATION REPORT.........1

II.  OFFENSE CONDUCT.............................................2

III. POST—OFFENSE CONDUCT........................................4

IV.  ADVISORY SENTENCING GUIDELINES..............................5

V.   CONCURRENCE IN THE FINDINGS OF THE PRESENTENCE REPORT.........6

VI.  GOVERNMENT'S ANALYSIS OF THE SECTION 3553(a) FACTORS AND
     SENTENCING RECOMMENDATION....................................7

     A. Advisory Sentencing Guidelines...........................7

     B. Analysis of the Section 3553 (a) Factors..................7

          1.   18 U.S.C. § 3553 (a)(1)...........................9

          2.   18 U.S.C. § 3553(a)(2)...........................14

     C.   Restitution............................................15

     D.   Government Sentencing Recommendation...................16

VII. CONCLUSION.................................................16

i

1

**<u>TABLE OF AUTHORITIES</u>**

2

<u>DESCRIPTION</u>                                                                <u>PAGE</u>

3

**Cases**

4

<u>United States v. Booker</u>,
    543 U.S. 220 (2005) ......................................... 13

5

6

<u>United States v. Cantrell</u>,
    433 F.3d 1269 (9th Cir. 2006) ................................ 8

7

<u>United States v. Contreras</u>,
    180 F.3d 1204 (10th Cir. 1999) .............................. 13

8

<u>United States v. Dyck</u>,
    334 F.3d 736 (8th Cir. 2003) ................................ 13

9

10

<u>United States v. Guzman</u>,
    236 F.3d 830 (7th Cir. 2001) ................................ 13

11

<u>United States v. Ifediba</u>, No. 2:18-CR-0103-RDP-JEO,
    2019 WL 2578124 (N.D. Ala. June 24, 2019) ................... 12

12

<u>United States v. Knows His Gun</u>,
    438 F.3d 913 (9th Cir. 2006) ................................. 8

13

14

<u>United States v. Luna</u>,
    332 F. App'x 778 (3d Cir. 2009) ............................. 12

15

16

<u>United States v. Nichols</u>,
    464 F.3d 1117 (9th Cir. 2006) ................................ 8

17

<u>United States v. Sprei</u>,
    145 F.3d 528 (2d Cir. 1998) ................................. 13

18

19

20

21

22

23

24

25

26

27

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

**I.   INTRODUCTION AND THE PRESENTENCE INVESTIGATION REPORT**

3    On December 2, 2020, defendant Steve Katsuya Akune ("defendant")
4 pleaded guilty, pursuant to a plea agreement (CR 8) to a one-count
5 information, charging a violation of 18 U.S.C. § 1344 (bank fraud)
6 filed on October 23, 2020 (CR 1).

7    The United States Probation & Pretrial Services Office
8 ("Probation Office") issued its Probation Disclosed Recommendation
9 Letter (CR 23) and Presentence Investigation Report ("PSR") on May
10 12, 2021 (CR 24).  In the PSR, the Probation Office calculated a
11 total offense level of 22,[2] including a three-level reduction for
12 acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(b) and a
13 criminal history category of I based on zero criminal history points
14 (CR 24 at ¶¶ 28-42), which is the same as the plea agreement's
15 stipulated calculation of the offense level at 22 (CR 8 at ¶ 13),
16 resulting in a PSR advisory guidelines range of 41-51 months.

17    The Probation Office has not identified any factors that warrant
18 a departure from the applicable guidelines range, but has identified
19 defendant's background and characteristics and the parties' agreement
20 as factors that warrant a sentence below the advisory guidelines
21 system (PSR ¶¶ 111-13) and, accordingly, recommends a downward
22 variance to a sentence of 21 months, which translates into a downward
23 variance of six levels from the low end of offense level 22 (41-51
24 months) to offense level 16 (24-30 months), which is four additional
25 levels beyond the downward variance of two levels in the plea

26

27

28    [2] The PSR uses the edition of the United States Sentencing
Guidelines currently in effect (the manual in effect as of November
2018).  (PSR ¶ 26).

agreement from offense level 22 (41-51 months) to offense level 20 (33-41 months).  The two-level downward variance in the plea agreement is based on recognition of defendant's early acceptance of responsibility and agreement to hold these proceedings by VTC which lessens the burden on the court system.  (CR 23, Probation Disclosed Recommendation Letter at 5; PSR ¶¶ 3-5).

## II.  OFFENSE CONDUCT

Defendant Akune worked for Mutual Trading, a business engaged in the import, export, and distribution of Japanese brands of food, alcoholic beverage and restaurant supplies, as its senior manager of accounting.  (PSR ¶ 10).[3]  Defendant's job duties included receiving checks made payable to Mutual Trading.  Defendant was responsible for overseeing the accounting for those checks in Mutual Trading's books and records and then depositing those checks into Mutual Trading's bank accounts.  (PSR ¶ 11).  Defendant's immediate supervisor was co-schemer Hiroyuki Kodama,[4] who was Mutual Trading's vice president, chief financial officer, and head of accounting.  (PSR ¶ 12).

Defendant, together with co-schemer Kodama, executed a scheme from March 2010 to February 2018 to obtain money in the custody and control of a bank account they fraudulently opened in the name of Mutual Trading without the knowledge and authorization of Mutual

---

[3] The statement of facts set forth in the Offense Conduct section cite to the applicable paragraph number of the PSR.  These same facts regarding defendant's offense conduct derive from the stipulated Statement Of Facts In Support Of Plea Agreement For Defendant Steve Katsuya Akune, filed as Exhibit "B" at 19-21 of the plea agreement (CR 8).

[4] Kodama was charged and pleaded guilty in the related case of United States v. Hiroyuki Kodama, CR 20-624-FMO, and is scheduled for sentencing on September 23, 2021.  The Court had scheduled the sentencings for both defendants on the same date, but their respective sentencings have since been continued to different dates.

Trading at California Bank & Trust.  (PSR ¶¶ 13-14).  In fraudulently opening this Mutual Trading account ("fraudulent" or "off-book" account), they falsely represented to the bank that a meeting of Mutual Trading's Board of Directors had been held at which Mutual Trading adopted a resolution authorizing the opening of the bank account, knowing that no such meeting and no such authorization had occurred.  (PSR ¶ 15).  Co-schemer Kodama took possession of checks mailed to Mutual Trading and fraudulently diverted these checks by directing defendant Akune to endorse and deposit them into the fraudulent Mutual Trading account.  (PSR ¶ 17).  Defendant took possession of these checks, and fraudulently diverted these checks by endorsing and depositing them into the fraudulent Mutual Trading account.  (PSR ¶ 17).

In order to further execute and conceal the scheme, defendant and co-schemer Kodama falsified Mutual Trading's books and records by (1) failing to include any reference to the fraudulent bank account and the funds it held in Mutual Trading's books and records and (2) failing to record the deposits of checks made payable to Mutual Trading into the fraudulent Mutual Trading bank account and withdrawals made from that account, unbeknownst to others at Mutual Trading.  (PSR ¶ 18).

As a result of the fraudulent scheme, defendant and co-schemer Kodama embezzled approximately $2,817,691 in checks made payable to Mutual Trading into the fraudulent Mutual Trading bank account.  (PSR ¶ 19).  They withdrew those funds for their personal benefit and to pay personal expenses by writing checks made payable to themselves and others, purchasing cashier's checks, and transferring the funds

out of the account by wire.  An FBI forensic accountant[5] analyzed the fund withdrawals.  For instance, defendant used the funds to pay the balance due on his credit cards and a personal bank line of credit and to pay for expenses associated with his home renovation, totaling approximately $1,023,719 including 42 payments to Union Bank totaling $385,000; 86 debit transactions to a Chase credit card account totaling $380,219.41 and 34 checks to Akune totaling $258,500.  (PSR ¶¶ 20-21).

There were additional funds embezzled, deposited, and withdrawn from the fraudulently opened Mutual Trading account that the FBI forensic accountant was not able to specifically attribute directly to either defendant or co-schemer Kodama, but are part of the overall loss amount of $2.8 million and both defendants are responsible for the total amount of loss as part of their jointly undertaken scheme to defraud.[6]

**III. POST—OFFENSE CONDUCT**

When Mutual Trading discovered the fraudulent scheme, defendant was terminated from employment in February 2018.  (PSR ¶ 22).  Mutual Trading filed a lawsuit against defendant in Los Angeles County Superior Court and a default judgment in the amount of $1,166,896.23 was entered against defendant on August 13, 2018.  (PSR ¶ 6, n.1).  In November 2018, the parties in the civil case stipulated to a settlement agreement in which defendant would pay the amount of the

---

[5] The PSR refers to an "IRS" forensic accountant who analyzed the fund withdrawals of the embezzled checks.  To clarify, the forensic accountant is employed by the FBI.

[6] As noted in the Post-Offense Conduct section below, defendant stipulated in a settlement agreement in the civil lawsuit brought by Mutual Trading to repay $1,166,896; co-schemer Kodama agreed to repay $1,696.021.

4

judgment.   The plea agreement in this criminal case provides that payments defendant has made to Mutual Trading in connection with his civil settlement may be credited against the amount of restitution owed in this criminal case, subject to the approval of the Clerk's Office.  (PSR ¶ 6; CR 8 ¶ 6).   Defendant is responsible for ensuring sufficient documentation establishing entitlement to any payment credit is provided to the Financial Litigation Section of the United States Attorney's Office.  (PSR ¶ 6; CR 8 ¶ 6).

## IV.   ADVISORY SENTENCING GUIDELINES

The government submits that defendant's advisory sentencing guidelines calculations are those agreed to by the parties in the plea agreement, which are the same as and supported by the PSR.  In accord with the calculations of the plea agreement (CR 8 at 10 at ¶ 13), defendant's guidelines offense level is 22, prior to any variance, resulting in an advisory guidelines range of 41-51 months.

| | | |
|---|---|---|
| Base Offense Level: | 7 | U.S.S.G. § 2B1.1(a)(1) |
| Specific Offense Characteristics | | |
| Loss between $1.5-$3.5 million: | +16 | U.S.S.G. § 2B1.1(b)(1)(I) |
| Adjustments | | |
| Abuse of Position of Trust | +2 | U.S.S.G. § 3B1.3 |
| Acceptance of Responsibility | -3 | U.S.S.G. § 3E1.1(a), (b) |
| Total Offense Level: | 22 | |

Defendant in the plea agreement stipulated to a total offense level of 22, resulting in a sentencing range of 41-51 months.  (Def. Sen. Pos. at 3, 6).  Defendant did not file any objections to this same calculation in the PSR.

\    Further, in accord with the plea agreement, the government recommends a downward two-level variance, based on recognition of defendant's early acceptance of responsibility by his agreement to hold these proceedings by VTC which lessens the burden on the court system, to an offense level of 20, resulting in an advisory guidelines range of 33-41 months.  (CR 8 at ¶ 3(e)).

As discussed below, the government further recommends in its sentencing position, beyond the variance in the plea agreement, an additional downward variance of three levels, resulting in an offense level of 17 and a sentencing range of 24-30 months.  The government's recommendation for this additional downward variance of three levels is based on: (a) the nature and circumstances of the offense, particularly, there is reason to believe that defendant's participation in this embezzlement was done with the direction of his immediate supervisor and chief financial officer, namely, co-schemer Kodama; (b) recognition that defendant appears to have repaid, subject to verification, his portion of the civil settlement with Mutual Trading ($1,166,896.23) which constitutes an appreciable portion of the criminal restitution amount of $2,817,691, prior to defendant becoming aware of the criminal investigation; (c) low likelihood of recidivism and diminished need for specific deterrence; and (d) defendant's personal history and circumstances, particularly, his prior filial responsibilities as an adult caretaker for his mother and father when they were in ailing health.

**V.    CONCURRENCE IN THE FINDINGS OF THE PRESENTENCE REPORT**

The government concurs in the findings and offense level calculations of the PSR prepared by the Probation Office in this case

1    which are the same as the plea agreement between the parties.  As

2    noted above, defendant did not object to the same findings and

3    offense level calculations of the PSR.[7]

4    **VI.  GOVERNMENT'S ANALYSIS OF THE SECTION 3553(a) FACTORS AND**

5    **SENTENCING RECOMMENDATION**

6         The following discussion addresses the other § 3553(a) factors

7    beyond those taken into account already by the advisory sentencing

8    guidelines.

9         **A.   Advisory Sentencing Guidelines**

10        As noted above, the government and defendant jointly agreed in

11   the plea agreement that the advisory offense level is 22 (41-51

12   months).

13        **B.   Analysis of the Section 3553(a) Factors**

14        In addition, the plea agreement contemplated a two-level

15   downward variance from offense level 22 (41-51 months) to offense

16   level 20 (33-41 months) for extraordinary acceptance of

17   responsibility.  By this sentencing position, the government further

18   moves, beyond the plea agreement, for an additional three-level

19   downward variance to an offense level of 17 (24-30 months) and

20   requests that defendant be imprisoned to a low-end term of 24 months.

21   The government's recommendation takes into account Section 3553(a)

22   factors, as discussed below.

23        The seriousness of the overall scheme to embezzle funds from his

24   corporate employer, the magnitude of the loss in excess of $2.8

25   million, the repeated and multiple thefts of his employer's funds

26

27        [7] As to the custodial sentence, the Probation Office ultimately
     recommends a variance and a sentence of 21 months.  <u>See</u> Probation
28   Disclosed Recommendation Letter (CR 23) at 2.

that continued uninterrupted for about eight years, and the abuse of defendant's position of trust in his role as senior manager of accounting where his duties include receiving checks and overseeing the accounting for those checks into the company's books and records and corporate bank accounts, weigh in favor of imposing a reasonably appropriate custodial sentence of 24 months.

While not definitive, the Guidelines range provides the starting point for finding a reasonable sentence and must then be considered with the factors set forth in 18 U.S.C. § 3553 (a).  See United States v. Cantrell, 433 F.3d 1269, 1279 (9th Cir. 2006).  "To comply with the requirements of Booker, the district court must have sufficiently considered the Guidelines as well as the other factors listed in § 3553(a).  This requirement does not necessitate a specific articulation of each factor separately, but rather a showing that the district court considered the statutorily-designated factors in imposing a sentence."  United States v. Nichols, 464 F.3d 1117, 1125 (9th Cir. 2006) (quoting United States v. Knows His Gun, 438 F.3d 913, 918 (9th Cir. 2006)).

The Section 3553(a) factors are as follows:

1) The nature and circumstances of the offense and the history and characteristics of the defendant;

2) The need for the sentence imposed –

    (A)  To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)  To afford adequate deterrence to criminal conduct;

           (C)   To protect the public from further crimes of the
defendant; and

           (D)   To provide the defendant with needed educational
or vocational training, medical care, or other
correctional treatment in the most effective manner;

3) The kinds of sentences available;

4) The kinds of sentence and the sentencing range
established for the offense and the defendant as set forth
in the Sentencing Guidelines;

5) Any pertinent policy statement issued by the Sentencing
Commission;

6) The need to avoid unwarranted sentence disparities among
defendants with similar records who have been found guilty
of similar conduct; and

7) The need to provide restitution to any victims of the
offense.

See 18 U.S.C. § 3553(a).  The government believes that the factors
set forth in 18 U.S.C. § 3553(a) suggest custody of 24 months and
that such a sentence would be "sufficient, but not greater than
necessary" to comply with the purposes enumerated in 18 U.S.C. §
3553(a)(2), discussed further below.  18 U.S.C. § 3553(a).

       1.   18 U.S.C. § 3553 (a)(1)

18 U.S.C. § 3553 (a)(1) requires the Court to consider the
nature and circumstances of the offense and the history and
characteristics of defendant.  These factors warrant a sentence of 24
months imprisonment.

1   Defendant's offense was serious, long-lasting, and resulted in
2   substantial harm to his employer.  Defendant's role was essential.
3   His job duties enabled him to commit the embezzlement as he was a
4   senior accounting manager responsible for both receiving the
5   embezzled checks at issue and depositing them into the corporate bank
6   account, including the fraudulently opened off-book bank account
7   defendant established with his co-schemer Kodama.  Because of
8   defendant's and co-schemer Kodama's roles at the company, the
9   embezzlement was difficult for the company to detect.  By essentially
10  stealing checks made payable to his company and diverting them into
11  an off-book bank account, defendant's criminal conduct was integral
12  to a scheme to defraud his employer of more than $2.8 million.  Given
13  defendant's position at the company, however, there is reason to
14  believe that as between defendant and co-schemer Kodama, defendant
15  was not the primary instigator of the embezzlement and was under the
16  direction of his immediate supervisor and chief financial officer,
17  co-schemer Kodama; nonetheless, defendant's misconduct was essential,
18  repeated, and financially benefitted defendant in the amount of at
19  least $1,166,896, which is the amount of the civil settlement.
20  Defendant used the funds to pay the balance due on his credit
21  cards and a personal bank line of credit from which they used to
22  buy cars, pay off his children's college tuition, and remodel
23  their house.  (PSR ¶ 86).
24      For sentencing mitigation, defendant hired a psychologist to
25  provide support for a downward variance.  The government supports a
26  downward variance, and has done so since seeking to resolve this case
27  by plea disposition.  The government took into account the

28

1    circumstances of defendant's situation initially in the plea

2    agreement with a downward variance (two levels) and then further in

3    this sentencing recommendation with an additional variance (three

4    more levels) for a net total of five levels.  The psychological

5    assessment supplements the biographical information previously

6    provided in the PSR, but does not provide any new basis for a

7    downward variance.

8         Briefly, in response to defendant's sentencing arguments about

9    his personal history and characteristics, the government points out

10   that defendant conflates his respect and obedience toward elders and

11   particularly, his father, traditional and laudable values, to suggest

12   that because of "my cultural imperative" (his words) he was

13   "pressure[d]" by co-schemer Kodama to commit these ongoing and

14   repeated acts of fraud and theft that lasted eight years.  ("Def.

15   Sen. Pos." at 5).  This is merely, in the government's view, a veiled

16   effort to shift blame to his supervisor and does not excuse defendant

17   from taking responsibility for his own repeated and deliberate

18   conduct that he committed as a mature adult in his 50s, not a young

19   child.  The Court should reject any suggestion that defendant "was

20   programmed by the nature of his historical relationship with his

21   father" as causal "psychological underpinnings of [defendant's]

22   offense conduct."  See "Def. Sen. Pos." at 18.

23        Defendant "characterized his father as having been old-fashioned

24   and strict, but fair" (PSR ¶ 51), as is true for many father-son

25   relationships; defendant "reports that he enjoyed a happy

26   childhood and that his parents were supportive of him." (PSR

27   ¶ 58).  Further, defendant stated that his parents were "serious

28

                                    11

1  about discipline and maintaining traditional cultural

2  standards." (PSR ¶ 58).  Most tellingly, as defendant himself

3  states in comparing his father with co-schemer Kodama: "The

4  difference is that my [defendant's] father would never have asked me

5  to break the law." ("Def. Sen. Pos." at 5).

6      Defendant knew from the inception of the scheme that he was

7  breaking the law, and he knew that because: (1) theft is an obvious

8  crime and (2) he was raised by a family that taught him right from

9  wrong.  It is a distortion to fault his upbringing as a child 50

10  years ago or his culture to deflect responsibility for his own

11  criminal conduct.  <u>See</u> <u>United States v. Ifediba</u>, No. 2:18-CR-0103-

12  RDP-JEO, 2019 WL 2578124, at *2 (N.D. Ala. June 24, 2019) (in a fraud

13  trial, the district court excluded evidence that a defendant could

14  argue to the jury that in her culture and based upon the relationship

15  she had with her brother, she was subordinate and compelled to act in

16  a subservient manner and follow his directions).  "The court notes

17  that neither the Supreme Court nor the Eleventh Circuit have endorsed

18  a 'cultural defense' in federal criminal law that would excuse a

19  defendant's criminal conduct perpetrated due to his or her

20  subservience to a third party.  Nevertheless, courts have rejected

21  defendants' attempts to excuse their criminal behavior based on

22  threats and/or domination by a third party that do not rise to the

23  level of affirmative defenses of duress or necessity."[8]

24  _____

25      [8] In addition, as to defendant's argument for a variance based
    on reference to "my cultural imperative," <u>United States v. Luna</u>, 332
26  F. App'x 778, 783 (3d Cir. 2009) is instructive.  There, the district
    court at sentencing rejected the defendant's argument "for a variance
27  based on his subservience to his father, who was a central player in
    the drug conspiracy.  Luna's argument centered on the allegedly

28                              12

1    Defendant's argument for an even further lower sentence for his

2 theft of millions of dollars from his employer based on a claim that

3 "he took the money as an unconscious choice to pay himself back for"

4 "his sacrifice" of supporting his elderly parents turns a virtuous

5 family value on its head. ("Def. Sen. Pos." at 20).  Children, when

6 they become adults, often encounter family circumstances where they

7 are called upon to sacrifice and care for their aging parents, just

8 as when the roles were reversed and their parents sacrificed for them

9 in raising a family.  Defendant's decision to repeatedly steal money

10 to renovate his home and pay personal expenses was not an

11 "unconscious choice" and was not an entitlement "to pay himself

12 back."

13    Finally, with respect to taking defendant's health into account

14 at sentencing, the PSR notes that defendant has never been diagnosed

15 with a mental health condition and his physical conditions (high

16 blood pressure, gout) are managed and treatable with medication.

17 (PSR ¶¶ 68-72).  Until the pandemic, in fact, defendant reports that

18

19 patriarchal nature of Mexican culture."  <u>Luna</u> affirmed, stating: "The
Sentencing Guidelines advise that a defendant's race and national

20 origin are never relevant for sentencing purposes, U.S.S.G. §§
5H1.10, and at least three Circuit Courts have concluded that

21 considering a defendant's culture runs afoul of the Guidelines.

22 <u>United States v. Dyck</u>, 334 F.3d 736, 743 (8th Cir. 2003); <u>United
States v. Contreras</u>, 180 F.3d 1204, 1212 n. 4 (10th Cir. 1999);

23 <u>United States v. Sprei</u>, 145 F.3d 528, 536 (2d Cir. 1998); <u>see also</u>
<u>United States v. Guzman</u>, 236 F.3d 830, 833 (7th Cir. 2001)

24 ('lean[ing] to the view that [U.S.S.G § 5H1.10] does forbid
consideration of ethnicity or 'cultural heritage' in the sentencing

25 decision').  While the Guidelines were rendered advisory by <u>United
States v. Booker</u>, 543 U.S. 220, it is significant that no court since

26 has questioned the wisdom of § 5H1.10 or the courts endorsing it.  We

27 see no reason to be the first.  The District Court did not commit
procedural error by refusing to consider Luna's cultural heritage

28 argument."

13

he was a "physical fitness buff, and over the years, he has spent thousands of hours working out." (Def. Sen. at 22). His health conditions present no additional reasons for a further variance.

Accordingly, taking into account the extent and scope of the fraud, the loss, the length of time of the embezzlement, defendant's receipt, deposit, and fraudulent diversion of the embezzled checks funds from his corporate employer in his capacity as senior accounting manager, and defendant's use of the funds for personal use, which factors are accounted for the advisory guidelines calculations, a 24-month sentence of imprisonment is appropriate as sufficient but not greater than necessary sentence to accomplish the goals of sentencing.

### 2.   18 U.S.C. § 3553(a)(2)

18 U.S.C. § 3553(a)(2) requires the Court to consider the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of defendant, and to provide defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. The government respectfully submits that a sentence of 24 months (1) will appropriately reflect the seriousness of the offense and promote respect for the law; (2) will deter future criminal conduct from both the defendant and others without being greater punishment than necessary; and (3) will serve to protect the community.

By requiring defendant to spend 24 months in custody, the Court will impress upon defendant the seriousness of his crime and will

give defendant time to reconsider his actions in light of the consequences.

In mitigation to support an overall five-level downward variance are defendant's early and extraordinary acceptance of responsibility, including his agreement to proceed by way of VTC for all court proceedings, defendant's repayment of the civil settlement prior to defendant becoming aware of the criminal investigation, defendant's conduct relative to his co-schemer, while a serious abuse of trust, was directed by his immediate supervisor, defendant's lack of prior criminal offenses, stable residential and employment history, low likelihood of recidivism, and extraordinary filial responsibilities as an adult son in caretaking for his parents in failing health.

**B.   Restitution**

In his plea agreement, defendant agreed to pay full restitution. The government requests that the Court order restitution to be paid in full to Mutual Trading in the amount of $2,817,691.  (PSR ¶ 23).

The government recommends payment of restitution payable in full and not limited to nominal monthly payments.  In addition to defendant's primary residence which mortgage was paid off and has substantial equity, he and his sister own another residence in which his son and/or a family friend live without paying rent.  (PSR ¶¶ 86-87).  The Probation Office accounts for defendant's wife's anticipated financial needs during defendant's potential custodial sentence in concluding that defendant should make only nominal restitution payments.  However, there may be additional financial resources for support available in that defendant and his wife contribute to 401k accounts, but no 401k accounts were listed on the

required financial documents (PSR ¶ 88), and, in addition, defendant's wife's wages are deposited into a bank account which defendant did not disclose.  (PSR ¶ 87).  The PSR notes that "Akune did not provide requested information about his wife's bank accounts."  (PSR at n.2).  Based on the financial information provided, defendant has not met his burden to show that he does not have the ability to pay.

### C.   Government Sentencing Recommendation

The government respectfully requests that this Court find that defendant's advisory sentencing guideline offense level (pre-variance, post acceptance) is 24 (as agreed to by defendant and calculated by the PSR); grant a two-level downward variance consistent with the plea agreement for defendant's extraordinary acceptance of responsibility; and further grant an additional three-level downward variance based on the additional mitigating factors identified in the PSR and Probation Recommendation Letter, and as discussed in this sentencing position, resulting in an overall post-variance offense level of 17 and a sentencing guideline range of 24-30 months.

## VII. CONCLUSION

Based on the foregoing reasons, the government respectfully requests that the Court:

a)   find that defendant's post-acceptance and pre-variance advisory guidelines offense level, consistent with the plea agreement, is 24;

b)   grant a two-level downward variance to offense level 22 for the reasons stated above, consistent with the plea agreement, and

16

grant an additional three-level downward variance to offense level 17 for the additional reasons identified in the PSR and Probation Recommendation Letter, and as discussed in this sentencing position, resulting in an overall post-variance offense level of 17 and a sentencing range of 24-30 months;

     c)    impose a sentence of 24 months in custody that appropriately balances the mitigating and aggravating factors in this case; and

     d)    order payment of: (1) restitution in the amount of $2,817,691 to be paid to Mutual Trading; and (2) a $100 special assessment for the count of conviction.

**<u>CERTIFICATE OF SERVICE</u>**

I, **Brenda Gervais**, declare:

That I am a citizen of the United States and a resident of or employed in Los Angeles County, California; that my business address is the Office of United States Attorney, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of 18; and that I am not a party to the above-titled action;

That I am employed by the United States Attorney for the Central District of California, who is a member of the Bar of the United States District Court for the Central District of California, at whose direction I served a copy of:

<u>GOVERNMENT'S COMBINED CONCURRENCE IN THE FINDINGS OF THE PRESENTENCE INVESTIGATION REPORT AND POSITION RE: SENTENCING OF DEFENDANT STEVE KATSUYA AKUNE</u>

☐ Placed in a closed envelope for collection and inter-office delivery, addressed as follows:

☒ Placed in a sealed envelope for collection and mailing via United States mail, addressed as follows: United States Probation & Pretrial Services
U.S. Probation Officer Eduardo Cervantes
Edward R. Roybal Federal Building and U.S. Courthouse
255 East Temple Street,
Suite 1410, LA, CA 90012

☐ By hand delivery, addressed as follows:

☐ By facsimile, as follows:

☐ By Federal Express, as follows:

☒ Via email, as follows:

Eduardo_Cervantes@cacp.uscourts.gov

This Certificate is executed on **August 23, 2021**, at Los Angeles, California.  I certify under penalty of perjury that the foregoing is true and correct.

*Brenda Gervais*
Brenda Gervais
Legal Assistant